Good morning. May it please the Court. I'm Lisa Rasmussen and I represent Germaine Music. Let me state something. Welcome to the Court. We're anxious to hear your argument. Let me just state something at the onset. I practiced law for 25 years, mostly civil, some criminal. I have never been more thoroughly confused by a case in my life. I do not understand what this case is about. I don't understand the pie of dispute or what part of it is in dispute. So if you're going to argue, start with the very basics, please. Okay. That's understandable, Your Honor, because I spent hours and hours wading through it myself, not only the discovery issues, but also the underlying claims. And I understand as a lawyer, and certainly the Court is probably keenly aware, that it can be difficult dealing with pro se parties in any capacity. In this case, my client is – was a musician. He composed certain works during the early 70s, primarily, early to mid-70s. Four of those songs were used, later used, by the defendant, who is actually a successor defendant, in a production album that was produced by the Chilites. And that album – the Chilites had a couple very famous songs, Have You Seen Her and Oh Girl, that were produced on an album, I think, in 1976. One of the – four of the songs that my client produced were actually used by the Chilites. So it was his original composition, and the allegation is, however poorly framed by them as pro se parties, was that those works were exploited by the defendant in this case. There was also another issue, and that is that he had a catalog of 27 other copyrighted songs. And all of the songs in question were copyrighted, so they're protected under the copyright law. There were 27 other songs in a catalog that were transferred to someone named Donovan Jermaine, which is a similar name, and Donovan Jermaine maintains his catalog with UMG, the defendant in the case. So there were actually two separate allegations, and there were various claims framed by the plaintiff. Theft by deception was one of them. And if the court has questions with regard to the claims or with regard to the motion to dismiss or the failure to grant him leave to amend on the alleged fraud claim, I'd be happy to answer those. I'm not sure quite what the court wants to hear. He authored music. Yes. Copyrighted music. He composed it. And he claims that there are royalties due and outstanding from this defendant. Yes, and that with regard to the four songs that the Chilites used on their album that was produced, Message to the World, in 1976, those four songs were exploited by the Chilites, and that was an act occurring through the defendant, because the producer of the Chilite album was UMG. Right. I hope that lends some clarification to the issue. And my understanding is that sometime during the discovery process, the defendant said you were owed royalties. We sent you a check. You endorsed it. We don't owe you anything more. Yes. And he claims that he never received that check. The address is actually a public park, that that's not his signature, and he produced evidence to that effect. And he actually requested discovery with regard that would have been telling on some of those issues, because they submitted a letter from an attorney named Leonard Levin that was unsigned. I mean, there were some other issues. So there was a dispute with regard to that check. That was their defense, was that you received a check for $934, and we don't owe you anything else. Is there a way of determining in an instance like this what royalties would be due? Is it how many times the song was played? What is it? Yes. And it has to do with the release of when the album is released and what royalties were received by the defendant from the production of the album. And those were discovery questions that he asked. And those were, that is why I say those were issues that would have been telling, and they would have assisted him in responding to the motion for summary judgment. Well, let's get to the morass about the discovery. Apparently, counsel on the other side said, well, let's kind of push off any discovery until we get these motions dealt with. That is exactly what they said. They didn't have their rule 26 conference until June 27th, and at that time, and even prior to that, I think it was decided amongst the parties that they would wait until July 23rd when they had I think what appears to me from the record to have been the only hearing. And they would wait and see what the court said about the dispositive motions that were pending. So then the other side immediately made discovery demands before the cutoff date. The other side made a demand to do a deposition of plaintiff on August 5th, which was one day after the cutoff. And they, I don't know that there was any, I think that actually there was some written discovery propounded, which the plaintiffs responded to. I mean, he, plaintiff, responded and provided the answers to the interrogatories, the answers to the request for admission. And he submitted to a depo on the 19th of August, which was 15 days after the discovery cutoff. So then he made his request for discovery after the so-called cutoff date. He did. He made them on the 18th. And so then the other side says, no, no, too late. Right. And without, and they still had him come for the depo, of course, which I thought was the egregious part because here he shows up in good faith for his deposition on the 19th. He's propounded his own discovery on the 18th. And never do they tell him, you know, you don't have to show up for the depo. It's after the discovery cutoff. You're doing this voluntarily. And, by the way, we're not going to respond to your discovery. They never tell him that. They wait until the last day that it would have been due on the 30th day, and they send a letter saying your request were propounded well after the discovery cutoff. We are not responding to them. And then the following day they file their motion for summary judgment. And I think in this case, I think it's clear from the case upon which plaintiff or appellant relies, the Garrett v. San Francisco case, that it's not only an abuse of discretion, it's a complete failure to exercise discretion because, in this case, the district court made no ruling on the motion to compel. It could clearly be construed and should have been construed as a Rule 56F motion to allow him and he wasn't even asking for more time for discovery. He was simply asking that the court compel the discovery he had already propounded. Another thing that's terribly confusing in this case is that, for some reason, when the court entered its order on the 25th of July, two days after the hearing, it stated in that order that it was denying UMG's motion to extend discovery because it appeared that extensive discovery had already taken place in this case, when, in fact, no discovery had taken place. The parties had essentially agreed to hold off on it. So I think it was certainly the court should have ruled on it. The discovery would have led to admissible evidence. It certainly would have enabled him to respond to the motion for summary judgment. In fact, he said that in his opposition to the motion for summary judgment, he filed the motion to compel discovery prior to filing the opposition to the motion for summary judgment. And the court summarily resolves all the issues and doesn't rule at all on the motion to compel, which would have led to responses that he could have used then in his opposition to the motion for summary judgment. When did you become counsel? I became counsel approximately March of last year. It was after this court had issued an order stating that the plaintiff and appellant was a corporate entity, which technically he's not, but it is good that I'm here, I think, and that he was to retain counsel, that he could not represent himself. That may be the one thing we can all agree about. Would you like to save a little time for rebuttal? Yes, I would. Thank you, Your Honor. Thank you for your argument. Counsel? Good morning, Your Honors. Jeff Goldman for the defendant and the appellee. I'd like to, I think, start from the very, very beginning, Your Honors, because I think that the confusion in this case was caused by the plaintiff, and now our client is being disadvantaged by that on appeal because the very confusion the plaintiff created is now threatening to cause a problem for us. But, in fact, the issues here are really very simple. There are two separate business units of our client that are at issue here, and really two entirely separate issues. Our client is both a record company and a music publishing company. There are two business units of the company. The music publishing company owns copyrights and musical compositions, the words and music of songs, and exploits those. The record company creates sound recordings, CDs, records, and sells those. And I believe what the plaintiff is claiming here are two entirely different things, one of which dates back 30-some years and the other which happened very recently. The other defendant in this case was BMI, which is a performance rights society, which is unrelated to our client, although we do business with them. And they and ASCAP are the two performance rights societies which collect money for public performances of songs. So when a song is performed on the radio, for example, a few cents are generated for the owner of the copyright, including the writer of the song if he possesses an ownership interest in the copyright. And BMI remits certain sums to the writers and the copyright owners of the songs for public performances. That was dismissed out for arbitration. Yeah. And as far as I know, the plaintiff ---- And what's the status of the arbitration? I personally have no idea, but I assume the plaintiff was free to pursue the arbitration with BMI if he chose to do so. I don't know if that was ever pursued. BMI is an entity that actually tracks the performance of songs? Yeah. BMI and ASCAP are nonprofit entities. They have a vast network. I don't know how they do it exactly, but every time a song is played on the radio, I think they use formulas and algorithms to determine what monies are attributable. And oftentimes for an old song, like the song's at issue here, it's a few cents. Maybe people will get checks for 30 cents or $4.20, but that's what BMI and ASCAP do. And I assume the plaintiff still has a relationship ongoing with BMI. You never know about those old songs with iPods and the like. Yeah. Some of the big songs are certainly still generating a lot of money. I don't know if the Shy Light songs are, but they're pretty good songs. I still recall them myself. The issue in this case arose, as best I can tell, and the simplest way to look at this, Your Honor, ultimately, is in the excerpts of record at page 57 as part of a declaration of a BMI employee or assistant general counsel. BMI internally apparently made a clerical error. The plaintiff's publishing company is called, he calls it Germaine Music. There was another publishing company unrelated to him and that BMI also was associated with called Donovan Germaine Music, a totally unrelated company but a very similar name. Someone at BMI made an honest mistake, as far as anyone knows, and some of his songs were temporarily listed in the catalog for Donovan Germaine Music. The plaintiff discovered this. He contacted BMI. BMI corrected the error. But at that point, the plaintiff decided that rather than accept the, I think it was, $36 check from BMI, he was very angry and sued them for $36 million. As best I can tell, he then decided to wrap into the case kind of a longstanding grudge he had against the old predecessor of our client on the record company side, completely separate from the publishing side, which was Phonogram Records. He had apparently an attorney in the 70s, which he now claims he never heard of but is a waste of skin as a human being. There was some kind of a dispute in the 70s that I have no knowledge of nor will the plaintiff talk about, but he tried to wrap these two different issues into this case. But ultimately, when you look at the record, the other page in the excerpts of record that I think is dispositive of this case is page 18, because page 18 of the excerpts of record sets forth the district judge's scheduling order in the case. It got all followed up because he thought it was a 1983 action. Well, the plaintiff initially filed it with a form used for federal prisoners, but the plaintiff managed to litigate this case. Despite his pro se status, he litigated this case like a lawyer. He filed an amended complaint. He filed a summary judgment motion. I understand. I've been through this morass. But there should have been a discovery plan worked out early on. Well, in the court's initial scheduling order, the court set a deadline for discovery to be completed of August 4th. The court also set a deadline for discovery motions and a deadline for dispositive motions. At one point during the discovery process, we actually sought to extend the discovery deadline. The plaintiff made all sorts of motions in this case, both permitted and non-permitted, but he also made strategic decisions like any litigant. And one strategic decision he made was to oppose our motion to extend the discovery cutoff date and, in fact, to make his own motion for an expedited trial. He didn't want any discovery. He wanted to go to trial immediately. He didn't need any discovery. And our motion was denied, perhaps for the reason that he opposed it. He then submitted later, maybe he changed his mind, but he submitted untimely discovery, an untimely discovery motion, discovery closed, and we filed a summary judgment motion. There was absolutely no evidence to support his claims. And I think that's not really even an issue on appeal. I think the only issue on appeal is the abuse of discretion standard that the judge should have allowed him to take discovery after the discovery cutoff date. But this case is very different than the Garrett case, because in this case, all parties were aware, the plaintiff was aware of the deadlines for six months. He actually opposed our request to extend the deadlines. And all of the motions at issue in this case were filed after the deadline that the district court imposed for all parties to abide by. I have a question about the check. What was the check for? Well, I would submit that the issue with the check is. Start by answering the question. Okay. What was the check for? What did it represent payment for? The check was, as I mentioned earlier, there was a record company issue and there was a managing issue. The check had to do with, I guess, the record company issue, which is what we initially thought he was suing over, and maybe he was. Back in the 70s, when the Shy Lights albums were released, the plaintiff was a writer of some of those albums, and Universal's predecessor on the record company side paid out royalties to the writers for sales of the Shy Lights albums, which are now long out of print. So the check was for royalties. The check was for mechanical royalties generated by sales of the Shy Lights albums dating back I don't know how many years. The reason I believe it was paid in 1991, keep in mind, Your Honors, that we had to go back to Mike Rafiche to figure this out. It was paid in 1991 because initially the plaintiff, through his counsel in the 70s, wouldn't sign the mechanical license. There was some kind of a dispute. It was revisited, I guess, in 1991. We paid him a check. The check was signed. It was cashed. He said in his deposition that it looks like his signature and he doesn't recall one way or the other whether he signed it or not. It seems to me that forecloses him from now arguing it wasn't his signature. How do we know that that's it? I'm sorry, Your Honor. How do we know that that's it, that that's the whole enchilada? Well, Your Honor, the burden of proof in this case needs to be on the record. I'm just asking based on this record, how do we know that that's it? Ordinarily in a case like this, this is part of the source of my confusion. One side would say, look, we may have owed you something. Here is the description of our relationship. Here is our calculation of exactly how much you were owed. Here are all the records to support it. The obligation has been satisfied. We sent you a check. That's everything we owe you. And then if the other side doesn't respond to that or admits that, it's proper summary judgment material. Well, I guess the answer to that question, Your Honor, is more of a procedural one. The plaintiff filed a lawsuit claiming his royalties had been underpaid. He had no evidence of that. Because the claim dated back so many years and the album had been out of print for so long, our client had to go back to their records, reconstruct the records, get records for microfiche. But what was very clear to us is certainly within the last three years, six years, five years, whatever the statute of limitations period could be, we hadn't sold the record and no royalties had been generated. Our files also showed that in 1991, 10, 12 years before, the plaintiff had inquired about his royalties, we had generated a check which represented the full amount of his royalties, and we had paid him. At a certain point, it's impossible for us to prove a negative when the plaintiff simply says, I think you owe me money, I don't have any evidence of it, but prove you don't. And I think that's what the summary judgment process is for. We filed a motion with a declaration setting forth that there was no evidence to support his claim. He had no evidence, and discovery was closed. And, you know, ultimately, I think that the issue really comes down to the fact that I don't think you can find the district court abuses discretion, abuses discretion by simply requiring all the parties to abide by the initial scheduling order in the case. The scheduling order in the case says that these deadlines are firm, they will only be – that they will not be changed except for good cause shown, and any motions filed after these dates will be stricken. That's exactly what happened in this case. And I would just submit, Your Honors, that the confusion generated by the plaintiff and some of his irregular filings in the case shouldn't cause our client any prejudice on this appeal. Do you agree that your client said, well, let's not move ahead with discovery until we get these motions rolled on? I'm sorry, Your Honor. I couldn't hear the question. Do you agree that your client said, we're not going to need to move ahead and think about discovery until these motions are rolled on? That will save us both a lot of money. No, that's – well, no, what our client said was there were two different summary judgment motions here. The first one was denied in large part and led to a published opinion. The second one is the one that's now at issue. At the time of the first summary judgment motion, our clients proposed to the plaintiff that since the motion is still pending, rather than take discovery now, let's ask the court to extend the discovery deadline out 180 days so that we can wait until the judge rules, and then we were hoping we'd win, and then we wouldn't have the discovery. But if we didn't, we'd take discovery then. The plaintiff initially agreed orally, but when we submitted the stipulation to him, he said, you know something, absolutely not. I don't want an extension of discovery. In fact, he filed a motion opposing the extension of discovery, and he filed a motion for an expedited trial. That's simply a strategic decision that a litigant makes in the course of litigation, perhaps because he didn't want to produce documents to us, perhaps because he thought an expedited trial would put pressure on us to settle or would be best for him. But that was a strategic decision that he made and is now trying to get out of it. We're the ones who asked for a discovery extension and it was denied. Now the plaintiff is essentially asking the court of appeal to impose on the district court a discovery extension.  Thank you, Your Honor. Roberts. Thank you for your argument, counsel. Rebuttal? Yes. Thank you. Just a few points. Justice Hawkins, you had inquired as to the status of the BMI arbitration. It's judged. Judged. Thank you. A lot of people will tell you there's no justice at the next one. I always try to be polite and err on the side of caution. Thank you. The BMI is proceeding an arbitration in New York. I am not licensed in New York, so I'm not handling that matter. I know that they are working with a lawyer in New York. Yes. And I don't know the status of it. I apologize for not knowing more about it. With regard to the issue, and I think you raise a good point when you say is this the whole enchilada and how do we know? That's exactly the point. First of all, he disputes receiving the check. He has stated so. He says he doesn't ever recall receiving that check. And we don't know if that's the whole enchilada. That's the problem because they never responded to any of the discovery. There could be more. There could be more money. There could be more production. We just simply don't know because they didn't respond to the discovery. He requested documents. He served them with requests for admission. None of that was ever answered. And with regard to the scheduling order, it is correct that that was initially generated from essentially a 1983 form. And, again, I know I said it earlier, there was really no discovery done in this case. UMG produced about 50 pages of documents, which included some printouts on the catalog issue on August 29th. Those were produced to my client. And there was nothing more that was ever given to him. Nothing was given at the conference on June 27th. At that time, the parties did agree. And with regard to my client's opposition to the 180-day extension, he opposed the 180-day part. He certainly agreed to extend it. He said at that time he would. He perceived the 180 days to be an unreasonable extension. Of course, he doesn't have 45 other pending cases. This was his only case. So he thought that that was too long and wouldn't have agreed to 180 days, but certainly did agree and agreed by his conduct when he showed up for the depot and responded to their requests after the discovery cutoff deadline. Okay. Thank you. Thank you very much. I thank both sides for their argument. The case just argued will be submitted for decision, and the Court will stand in recess for the day. All rise. Thank you. Thank you.
judges: Lay , B. Fletcher, Hawkins